STATE OF CONNECTICUT *v.* ANONYMOUS ET AL.
(1976–7)*

COURT OF COMMON PLEAS

QUINN, J. A motion to dismiss has been filed in each of thirty-three arrests made by several police departments for various violations of General Statutes § 53-300 and related statutes collectively known as the "Sunday Blue Laws." The motion to dismiss for each and every one of the alleged offenses is based on three grounds: (1) discriminatory enforcement and selective prosecution of § 53-300 violate the due process and equal protection clauses of both the federal and state constitutions; (2) the system of classifications under § 53-300 is so irrational as to comprise a regulatory scheme which arbitrarily discriminates against persons and entities similarly situated; (3) section 53-300 is unconstitutional because it is vague and unenforceable. For purposes of this memorandum and in an attempt to avoid confusion, the decision

* Thus entitled, in view of General Statutes § 54-90.

of this court on the motion to dismiss as filed in the first arrest case shall be dispositive of all of the remaining cases involving those violations.

The court held an evidentiary hearing on the motion to dismiss in which the defense questioned various police officers, the accused, and representatives from the office of the chief state prosecutor. In addition to witnesses heard by the court, the prosecuting attorneys and defense counsel have stipulated for the record as to the testimony of a number of other parties in this action. This court is not unmindful of the significance of the legal questions involved in reaching its determination, and at this point wishes to thank both the state's attorney and counsel for the accused for the complete and cooperative effort put forth in enabling the court to reach its decision.

Although historically the Connecticut Sunday Blue Laws originated in the tradition of setting aside a Sabbath day for religious worship, today the legal significance of the Blue Laws is based on the constitutionally permissible purpose of identifying a common day for general rest and recreation. *McGowan* v. *Maryland,* 366 U.S. 420. As was stated by the Connecticut Supreme Court in *State* v. *Shuster,* 145 Conn. 554, 557: "[T]he primary purpose of the legislation is not to enforce an institute of religion. . . . Although such statutes as this may be said to have had a religious origin, they are upheld as a valid exercise of the police power in recognition of the fact 'that the first day of the week by general consent is set apart "for rest" . . . . Such legislation is being increasingly regarded as day-of-rest legislation rather than as Sabbath or Sunday closing laws.' . . . [O]ne of the purposes of the statute was to encourage the use of the day for rest and recreation." This court

does not feel that any further discussion of the history or rationale for Sunday Blue Laws need be pursued.

The court now addresses itself to the first ground of the defendants' motions to dismiss, the issue of discriminatory enforcement and selective prosecution. At the hearing and on the stipulated evidence, the question of selective prosecution and discriminatory enforcement was raised by the defense in its claim that police officers will not make on-sight arrests for violation of the Blue Laws but will make arrests only as the result of specific complaints. In the instant cases, the court is fully cognizant of the fact that those arrests were made as a result of direct complaints by competitors and not as the result of individual police action. The evidence shows that competitors and employees of competitors made purchases from the accused in alleged violation of the Sunday Blue Laws and then made direct complaints to police departments as a result of those purchases. In none of those matters were defendants arrested by police because of on-sight violations or because of complaints from individuals totally unrelated to the defendants' line of business. Those arrests and subsequent prosecutions offend the equal protection clause of both the state and federal constitutions.

The defense further claims that the state of Connecticut has intentionally adopted a policy of selective enforcement of the Sunday Blue Laws. A memorandum from the office of the chief state's attorney specifically notes that "[p]olice will act only upon complaints for each arrest. They will NOT station themselves inside of the store to insure compliance of this statute except where there has been a refusal to close the offending section." To buttress its claim of selective enforcement, the

defense elicited testimony from one officer who stated that while on patrol he personally made purchases which he knew to be in violation of § 53-300 yet made no arrests of sales personnel. (Although the testimony of that officer is not available in official transcript form at this time, this is the best recollection of the court and of the attorneys as to the content of his remarks.)

The defense also introduced as evidence leases from the state of Connecticut to a restaurant. and a gift shop at Bradley International Airport. Those leases require the lessees to remain open seven days a week and require compliance with all the laws of the state of Connecticut. Evidence was produced which clearly shows that the restaurant and the gift shop consistently violate § 53-300 by the sale of prohibited articles on Sunday. That was acknowledged in the testimony of the proprietor of the gift shop. This in effect makes the state of Connecticut a recipient of the proceeds of illegal sales, based both on the lease arrangements and on the collection of sales tax.

In addition, the person in charge of renting the state armories testified that it would be impossible to rent the armories if § 53-300 were strictly enforced against concessionaires doing business on Sunday in those armories.

The defense further showed discretionary enforcement and selective prosecution of these laws by referring to sales at the Hartford Civic Center on Sunday. Again, the state tax department is moving against Sunday flea markets, not on the basis of violation of the Sunday Blue Laws, but on the basis of nonpayment of the sales tax as a result of the illegal transactions. The defense further introduced evidence concerning the sale of Connecticut state lottery tickets on Sunday in

alleged violation of § 53-300. It is apparent on the face of this detailed record that the standard used for enforcement of the Sunday Blue Laws through the office of the chief state's attorney and other agencies of the state of Connecticut is applied in an inconsistent, prejudicial and discriminatory manner.

To permit the state of Connecticut through its official agencies to condone violations of the Sunday Blue Laws by permitting illegal sales without prosecution is certainly discriminatory in its effect. This court cannot understand any situation where the state of Connecticut may prosecute an individual proprietor on the complaint of a competitor and still permit the sale of goods in violation of statute in its own facilities leased to private concerns.

Discriminatory enforcement of penal statutes has been a subject of concern for other courts as well. The New York Court of Appeals last year found selective prosecution solely at the behest of private interest groups to be impermissible discrimination under the fourteenth amendment. "The principal issue . . . is whether, with a history of disuse and absent a policy of general enforcement, prosecution at the instance of an interest group for its private purposes constitutes discrimination violative of the equal protection clauses of the Federal and State Constitutions. We think so and, accordingly, would reverse [the appellants' convictions] on that ground alone." *People* v. *Acme Markets, Inc.,* 37 N.Y.2d 326, 328. Even more recently, the New York Appellate Division dealt with the issue of selective enforcement in *Playtogs Factory Outlet, Inc.* v. *County of Orange,* 51 App. Div. 2d 772, 777, and stated: "[N]either the agencies enforcing our criminal laws nor the courts should allow themselves to be thus used as cat's

paws by those who seek to utilize the Sunday closing laws for their selfish competitive advantage. When prosecutors follow a policy with respect to enforcement of the Sunday closing laws of initiating criminal prosecutions for violations only on the complaints of private individuals, they become the tools of the private interest of the complainants and thus prostitute the State's law enforcement power to the service of selfish private goals."

Federal courts also appear to substantiate the position of state jurists as quoted above. This court first notes the case of *United States* v. *Falk*, 479 F.2d 616, 620 (7th Cir.) in which it was held that evidence of selective enforcement shifts the burden of proof to the prosecution to show lack of discrimination. "The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice. However, when a defendant alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose, we think a different question is raised." Furthermore, in *Cox* v. *Louisiana*, 379 U.S. 536, 557, the United States Supreme Court held that "[i]t is clearly unconstitutional to enable a public official to . . . engage in invidious discrimination among persons or groups . . . as in this case . . . by selective enforcement of an extremely broad prohibitory statute."

Based on the record before it, this court has arrived at the conclusion that prosecution in the instant cases falls within the scope of *People* v. *Acme Markets, Inc.*, supra; *Playtogs Factory Outlet, Inc.*, supra; *United States* v. *Falk*, supra; and *Cox* v. *Louisiana*, supra, in that the arrests reflect discriminatory enforcement and

selective prosecution of § 53-300, in violation of the due process and equal protection clauses of the federal and state constitutions.

As to questions 2 and 3 in defendants' motion to dismiss, the court will treat both issues together, subsuming them under the argument that § 53-300 and related statutes are vague, unenforceable, and therefore unconstitutional under state and federal guarantees of equal protection.

To substantiate the claim of vagueness, defense counsel called to the stand a number of witnesses whose testimony reflected the pervasive confusion which currently exists in the interpretation of the Sunday Blue Laws. First, a witness testified that he was specifically told by the New Britain police department that he could sell canned goods. That witness was subsequently arrested for selling two cans of Chinese vegetables. A second witness testified that he purchased a can of Lysol spray, then lodged a complaint of the sale with the Hamden police department. Shortly thereafter, police called that witness at his home to ask if the Lysol spray was a medical necessity, a use categorized as a legal exception under § 53-300. When he confirmed that the spray was not for medicinal purposes, the salesperson was arrested. That same witness further testified to meeting with a captain of the Hamden police department concerning enforcement of the Sunday Blue Laws. At that meeting, the captain stated that there existed no list of specifically permitted items for sale. Although the captain personally believed that certain named items could be sold, he did not know if that would be true under the law.

The United States Supreme Court, in *McGowan* v. *Maryland,* 366 U.S. 420, set the standard for intelligibility of Sunday Blue Laws when it said

(p. 428): "We believe that business people of ordinary intelligence in the position of appellants' employer would be able to know what exceptions are encompassed by the statute either as a matter of ordinary commercial knowledge or by simply making a reasonable investigation . . . ." A careful reading of § 53-300 indicates that it does not in fact meet those requirements and indeed raises more questions than it answers. For instance, the statute allows the sale of "fruit"; does that encompass canned and/or dried fruit products as well as fresh fruit? Are powdered milk and other dehydrated milk products "dairy products" within the meaning of that term? Does canned grated Parmesan cheese qualify as a "dairy product"? If pizza dough made at an Italian bakery can be classified as a legally permissible "bakery product," why would not a frozen pizza in a supermarket also fall into that category? Can instant coffee or tea leaves be considered a "nonalcoholic beverage"? Public confusion as to the meaning of this statute is not unwarranted.

That confusion exists equally as much among those charged with enforcement of the statute. An official memorandum from the office of the chief state's attorney admonishes prosecutors that "[o]fficers will not discuss with any merchant, policy on the Sunday Sale Law. Additionally, it is not wise to advise as to what may legally be sold on Sunday. There are many gray areas in the law which need the interpretation of the courts. Advise the merchant to seek such advice from his attorney."

That proscription must be read in the light of the principle expressed by the United States Supreme Court in *Connally* v. *General Construction Co.*, 269 U.S. 385, in which the court said (p. 391): "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who

are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." That principle was reiterated on the state level in two cases, the first being *State* v. *Zazzaro,* 128 Conn. 160, 167, citing *Daggett* v. *State,* 4 Conn. 60, 63: "The purpose of the rule of strict construction is not to enable a person to avoid the clear import of a law through some mere technicality, but to enable the people of the State to know clearly and precisely what acts the legislature has forbidden under a penalty, that they may govern their conduct accordingly, and to make sure that no act which the legislature did not intend to include will be held by the courts within the penalty of the law." The second case is *State* v. *Moore,* 158 Conn. 461, 465: "A criminal statute must be strictly construed, and no act should be held to be within its ambit which does not fall within its spirit and the fair import of its language. *State* v. *Faro,* 118 Conn. 267, 273 . . . ; *State* v. *Parker,* 112 Conn. 39, 46 . . . ; *State* v. *Penner,* 85 Conn. 481, 484 . . . . The meaning of the statute cannot be extended by presumption or intendment. *State* v. *Zazzaro,* 128 Conn. 160, 167 . . . . No part of the statute is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase." Again, that standard was set forth by the federal court in *Smith* v. *Sheeter,* 402 F. Sup. 624, 628–29 (S.D. Ohio), where it was stated: "The primary issue raised by the [void-for-vagueness] doctrine is whether the particular statute is sufficiently definite to give fair notice to one

who would avoid its sanctions, and ascertainable standards to the factfinder who must adjudicate guilt under it. . . . Impermissibly vague laws offend this standard of fairness because they may trap an unwary individual and encourage arbitrary and capricious enforcement." Essentially, then, the test for determining whether or not a statute fulfils the constitutional requirements of definiteness is whether the enactment gives fair notice to a person of ordinary intelligence that his contemplated conduct is forbidden by the law. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be prohibited.

From the testimony produced before this court, cited above, and from the arguments of counsel in their briefs, it would appear that the ordinary citizen is incapable of determining what is prohibited and what is not prohibited for sale under the Sunday Blue Laws. When the office of the chief state's attorney indicates in its memorandum that there are many gray areas in the law, and when police officers and police departments are unable to determine the dividing line between permissible and impermissible sales, this court must question the clarity of the offenses prohibited under this statute.

The problems inherent in this type of vague statute were discussed at length in *Grayned* v. *City of Rockford,* 408 U.S. 104, 108: "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so

that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

This court finds the issue of vagueness closely related to the entire scheme of classifications delineated in § 53-300. A concurring opinion (Wachtler, J.) in *People* v. *Acme Markets, Inc.*, 37 N.Y.2d 326, found the question of classification equally as important as the issue of selective enforcement in analyzing Sunday Blue Laws and agreed with the majority opinion, which stated (pp. 331–32): "While the equal protection guarantee does not require absolute symmetry in classification, distinctions must reasonably relate to the legislative object sought to be attained. And there is a point at which proliferating exceptions to the general proscription of Sunday public selling reasonably may not be squared with the statutory purpose. Put another way, a point is reached where the exceptions swallow up the rule and render the total statutory scheme arbitrary." Following that line of thinking, the same conclusion was advanced in *Twin Fair Distributors Corp.* v. *Cosgrove,* in an unpublished memorandum of the New York case dated February 20, 1976. "This Court finds the polyglot of exceptions to the general closing mandate subverts the avowed legislative purpose in its relation to the realities of life today. As written, the law restricting Sunday sales denies equal protection because of the many infirmities in its statutory scheme. Its classifications being a vestige of another age, devoid of rhyme, reason, or symmetry,

must necessarily make for selective and discriminatory enforcement which at best has been sporadic, soon losing its momentum."

This court therefore arrives at the conclusion that the arrests and prosecutions under § 53-300 and related statutes were discriminatory and selective and violated the due process and equal protection clauses of the state and federal constitutions. In addition, this court determines that the so-called Sunday Blue Laws are so vague and ambiguous as to leave any reasonable law-abiding citizen in a complete·quandary as to what is prohibited by these laws, and that these laws are therefore completely unconstitutional.

The motions to dismiss are granted and the court dismisses the charges against all the defendants.